AARON D. FORD
Attorney General
SAMUEL L. PEZONE, JR. (Bar No. 15978)
Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, Nevada 89119
(702) 486-4070 (phone)
(702) 486-3768 (fax)
Email: spezone@ag.nv.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| VICTOR MONTELONGO,<br><br>Plaintiff,<br><br>v.<br><br>JAMES WEILAND, *et al.*,<br><br>Defendants. | Case No. 3:23-cv-00624-CSD<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants, Christopher Coulston (Coulston), Edward Elmore (Elmore), William Gittere (Gittere), Curtis Rigney (Lt. Rigney), and James Weiland (Weiland) (collectively "Defendants"), by and through counsel, Aaron D. Ford, Attorney General for the State of Nevada, Samuel L. Pezone, Jr., Deputy Attorney General, hereby move for summary judgment pursuant to Fed. R. Civ. P. 56.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. PROCEDURAL HISTORY AND MONTELONGO'S ALLEGATIONS

This action is brought by Plaintiff Victor Montelongo (Montelongo), an offender in the custody of the Nevada Department of Corrections (NDOC), pro se, pursuant to 42 U.S.C. § 1983. ECF No. 1-1. Montelongo filed his Complaint on December 7, 2023. *Id.* On June 7, 2024, this Court entered a Screening Order regarding the Complaint. ECF No. 6. Therein, this Court summarized the Plaintiff's pertinent allegations as follows:

> In late 2022 at ESP, Plaintiff was escorted out of his unit by a correctional emergency response team ("CERT") in response to an alleged assault on prison staff. His escort by Doe CERT officers

> was not recorded by video, though regulations required it. Plaintiff also needed treatment for a scalp wound that would not stop bleeding. Defendant Weiland informed Plaintiff that he would be charged with a disciplinary violation, assault on staff. Further, Weiland told Plaintiff that he had "really fucked up" for "touching his officers."
>
> The blood from Plaintiff's head wound matted Plaintiff's long hair and caused it to droop into his eyes and mouth. Plaintiff was in hand and leg restraints. Plaintiff was not combative during the escort. Because he could not use his hands to move the hair away from his face, he attempted to push it away with his tongue and by blowing on it. Weiland noticed the attempts by Plaintiff to move his hair and stopped the escort. He asked Plaintiff "what the hell [he] was doing."
>
> When he failed to understand Plaintiff's explanation, Weiland became irritated. Defendants Weiland and the Doe CERT officers took Plaintiff past the medical department and towards the property department. When they reached a camera "blind spot," Plaintiff was slammed to the ground. Weiland and the CERT officers pinned Plaintiff down and began to punch and kick him. With his face towards the concrete floor, an officer stomped on the back of his head. Plaintiff blacked out and could not maintain consciousness. He was taken to the local emergency room where medical staff documented that Plaintiff's head was swollen and he had compound fractures in his face and near his eye. Plaintiff also suffered from a broken hand in addition to bruising, lacerations, and abrasions across his entire body.
>
> In December 2022, Plaintiff received a disciplinary hearing for the assault on staff charge. The hearing was led by Defendant Lieutenant Rigney. . . . Plaintiff also informed Rigney at the hearing that he wasn't receiving treatment for his broken hand. Rigney found Plaintiff guilty of Battery on Staff for spitting on Weiland. . . .
>
> Plaintiff filed an appeal or administrative grievance regarding the disciplinary hearing, the excessive force, and the lack of treatment for his hand. Plaintiff alleges Warden Gittere and Doe Deputy Director have authority and responsibility to investigate and assist in the scheduling of medical access in response to grievances. Defendants Gittere and Doe Deputy Director responded to the appeal/grievance by dismissing the appeal of the disciplinary hearing and ignoring Plaintiff's allegations that his broken hand was not being medically treated.

*Id.* at 3:21-5:5 (citations omitted). Notably, Montelongo does not include any allegations regarding the preceding "assault on staff" that allegedly resulted in his "scalp wound." *See Id.*

Montelongo was permitted to proceed on two claims different Eighth Amendment claims: (1) an excessive force claim against Defendant Weiland and Doe CERT officers, *Id.*

at 5:26-6:11; and (2) an a "deliberate indifference to medical needs" claim against Defendants Lt. Rigney, Gittere, and a Doe Deputy Director, *Id.* at 9:8-15. Following discovery, Montelongo identified Defendants Coulston and Elmore as the Doe CERT Officers. ECF No. 41.

## II. SUMMARY OF THE ARGUMENT

Montelongo cannot establish that Defendant Weiland failed to intervene in any alleged excessive use of force. Montelongo cannot establish that CERT Officers applied more than *de minimis* force to place him on the ground after Montelongo spat on Sgt. Weiland, as Montelongo cannot establish that such was the cause of any of his documented injuries. Nor did CERT Officers apply force for any malicious or sadistic purpose, as force was necessary to restrain Montelongo and place a spit mask on his head after he spat at Sgt. Weiland during escort. Montelongo cannot establish that Defendants Elmore and Coulston were present for and personally participated in this particular use of force.

Montelongo cannot establish that any staff failed to treat his injuries following this incident. Moreover, Montelongo cannot establish that Defendants Gittere and Lt. Rigney—neither of whom are medical professionals—personally participated in any failure to treat Montelongo's injuries.

Defendants also lacked notice that their alleged actions would constitute a constitutional violation as such was not clearly established law at the time. Thus, Defendants are entitled to summary judgement on the merits of Montelongo's claim and, in the alternative, are entitled to qualified immunity. Finally, Montelongo's request for punitive damages lacks merit because he cannot prove Defendants violated his rights with malice, express or implied, by clear and convincing evidence.

## III. STATEMENT OF UNDISPUTED FACTS

Montelongo was housed at ESP from July of 2022 through August of 2024. Ex. A – Bed History. On October 28, 2022, Montelongo was transferred from Unit 7, Wing A, to Unit 9, Wing A. *Id.*

At all times pertinent, William Gittere was the Warden of ESP. Ex. B – Declaration of William Gittere at ¶1. Curtis Rigney was a Correctional Lieutenant at ESP on or after October 28, 2022, and he is now the current acting Associate Warden of Operations at ESP. Ex. C – Declaration of Lt. Rigney ¶1.

Edward Elmore and Christopher Coulston were Correctional Officers employed at ESP. Ex. D – Declaration of Christopher Coulston at ¶1; Ex. E – Declaration of Edward Elmore at ¶1. On the day of the alleged incident, neither officer was assigned to CERT. *Id*. Instead, both were culinary officers working the graveyard shift generally; but that night, both officers had been assigned to escort red tag offenders in Unit 7 to take their showers. *Id*.

James Weiland is a Correctional Sergeant currently employed at ESP. Ex. F – Declaration of James Weiland at ¶1. Sgt. Weiland was not a member of CERT per se, but part of his job responsibilities did include supervising CERT officers during an emergency response. *Id*. at ¶2. Nurses Femarie Gingoyon, RN, and Monisha Wilson, RN, were Correctional Nurses employed at ESP. Ex. G – Declaration of Monisha Wilson at ¶1.

**A. Use of Force, Incident No. IR-2022-ESP-002217**

*1. Spontaneous Use of Force in Unit 7*

On October 28, 2022, at around 7:50 PM, Officers Coulston and Elmore were tasked with escorting red tag offenders from the upper tier of Unit 7 to take their showers in the unit's lower tier. Ex's. D & E at ¶2; Ex. I – Investigation Detail Report for IR-2022-ESP-002217 at NDOC000276-NDOC000277, NDOC000279-NDOC000281. On or before 7:52 PM, officers arrived at Cell 32 to place Montelongo and his cellmate in wrist restraints through the cell door's food slot. *Id*.; Ex. J-2 – U7A Short Side Tier Surveillance Video at 07:52:40-07:53:00. Officer Elmore signaled to the "bubble officer" to open the cell door so the offenders could be placed in leg restraints; however, when the door opened, both offenders walked out of their cell before leg restraints could be applied. Ex's. D & E at ¶2; Ex. J-2 at 07:53:00-07:53:10. Ignoring officers' verbal commands to stop, Montelongo continued walking across the upper tier, in the opposite direction of the lower tier showers,

and stopped at Cell 41 to talk to the offenders therein. Ex. D & E at ¶2; Ex. J-4 – U7A Center Tier Surveillance Video at 07:53:10-07:53:30. Officer Elmore noted he could smell the scent of prison-made alcohol wafting from Cell 32. Ex. E at ¶2; Ex. I at NDOC000280.

Officer Coulston followed after Montelongo, giving repeated orders to stop. Ex's. J-2 & J-4 at 07:53:10-07:53:30; Ex. D at ¶3. Despite Officer Elmore's efforts to restrain Montelongo's cellmate, and ignoring the officers' contrary orders, Montelongo's cellmate also began walking toward Montelongo. *Id.*; Ex. E at ¶3. Officer Coulston approached Montelongo and twice ordered him to resume compliance with the escort, but Montelongo ignored these orders. Ex. D at ¶3; Ex. J-3 – U7A Long Side Tier Surveillance Video at 07:53:30-07:53:40. Officer Coulston placed his hand on Montelongo, and Montelongo began physically resisting him by attempting to pull away. Ex's. J-3 & J-4 at 07:53:40-07:53:50. Officer Coulston then announced the officers would return Montelongo and his cellmate to their cell without a shower. Ex. D at ¶3.

Upon hearing this, Montelongo again physically resisted the officers as he began attempting to wrest himself away from Officer Coulston. *Id.* at ¶4; Ex's. J-3 & J-4 at 07:53:50-07:53:55. Due to Montelongo's size and weight and Officer Elmore's preoccupation with Montelongo's cellmate—who was attempting kick and headbutt both officers—Officer Coulston was unable to place Montelongo prone to fully restrain him. *Id.* As a result, Montelongo continued to physically resist by shoving his right shoulder at Officer Coulston in an attempt to knock the officer down, to which Officer Coulston responded by placing Montelongo with his back up against the adjacent wall. Ex. D at ¶4; Ex's. J-3 & J-4 at 07:53:55-07:54:05. Officer Coulston then used his free hand to place a request for assistance over the institutional radio. Ex. D at ¶4.

Montelongo squirmed against the wall, while Officer Coulston attempted unsuccessfully to place Montelongo in a "chicken wing escort position." *Id.* at ¶ 5; Ex's. J-3 & J-4 at 07:54:05-07:54:35. However, the video confirms that Montelongo continued to resist and was able to break out of Coulston's grip and then physically wrestle with Coulston. Ex. D at ¶5; Ex's. J-3 & J-4 at 07:54:35-07:54:40. Coulston was again able to place

Montelongo up against the wall adjacent to Cell 43 while awaiting assistance from other officers. Ex. D at ¶5; Ex's. J-3 & J-4 at 07:54:40-07:55:00. CERT officers arrived at around 7:56 PM; CERT officers gave verbal orders for the inmates to lay on the ground, but neither inmate complied. Ex. D at ¶5; Ex. E at ¶4; Ex's. J-1 – U7A Sally Port Surveillance Video, J-3 & J-4 at 07:56:00-07:56:25. Responding officers then physically laid Montelongo prone on the ground, segmented him, and applied leg restraints. Ex's. J-3 & J-4 at 07:56:25-07:57:30.

Elmore and Coulston were relieved soon thereafter, and their injuries were assessed by nursing staff. Ex. D at ¶6; Ex. E at ¶5; Ex. G at ¶¶3-4, 7. Nursing staff and supervising staff directed them to go to William B. Ririe Hospital (WBRH) for further assessment. Ex. D at ¶6; Ex. E at ¶5; Ex. G at ¶¶3-4, 7. Coulston sustained an injury to his arm, while Elmore received a 1 cm laceration to his head. Ex. D at ¶6; Ex. E at ¶5; Ex. G at ¶¶3-4, 7. Neither officer was involved in later events that evening. Ex. D at ¶6; Ex. E at ¶5.

*2. Nursing Staff Examination in Visting Room Holding Cell*

Montelongo was then taken via restraint chair to a visiting room holding cell to be examined by Nurses Wilson and Gingoyon. Ex's. J-1, J-2, J-3, & J-4 at 07:57:30-08:07:45; Ex. J-5 – U7 Hallway Surveillance Video at 07:57:30-8:07:45; Ex. J-6 – Visiting Holding E Hallway Surveillance Video at 08:07:45-8:16:10. At around 8:41 PM, officers began recording this examination via a handheld camera. Ex. G at ¶5; Ex. K – Handheld Video from IR-2022-ESP-002217 at 00:00-01:00. Nursing staff noted that Montelongo's left eye was bruised and swollen shut with an actively bleeding laceration, that his left nose was bleeding, and that he smelled of alcohol. Ex. G at ¶5; Ex. K at 01:00-02:00; Ex. N – Excerpt of NDOC Medical Records at NDOC000184, NDOC000270. Staff did not note any injury to Montelongo's hands. Ex. G at ¶5; Ex. N at NDOC000184, NDOC000270.

Upon inquiry by Sgt. Weiland, Montelongo admitted to having consumed alcohol for "maybe a day" prior to the incident. *Id.*; Ex. F at ¶3. Montelongo reported experiencing headaches consistent with his inebriation. *Id.* While Nurse Wilson tended to Montelongo's wounds, Nurse Gingoyon contacted the NDOC Provider, APRN Lorenzo Villegas, who

directed staff to send Montelongo to the Emergency Room at WBRH for further assessment. Ex. G at ¶6; Ex. K at 02:00-06:34.

**B. Use of Force in Incident No. IR-2022-ESP-002218**

At 9:51 PM, CERT officers began escorting Montelongo from the visiting holding cell to the property room, where CERT officers intended to prepare Montelongo for transport to WBRH. Ex. F at ¶4; Ex. L – Investigation Detail Report for IR-2022-ESP-002218 at NDOC000060-NDOC000063. While Sgt. Weiland supervised the escort, he was not physically involved with the escort. *Id.* Montelongo became agitated and non-compliant during the escort, attempting to turn towards and pull away from the CERT officers. In response, officers gave several orders for Montelongo to face forward and comply with escort. Ex. F at ¶4.

Montelongo then attempted several times to stop the escort entirely. *Id.* at ¶5. In response, the officers resumed the escort using "a modified wrist lock," whereby Montelongo was escorted walking backwards. *Id.* at ¶5; Ex. L at NDOC000060-NDOC000063. However, Montelongo continued to turn towards officers during the escort and attempted to pull away from the escort. Ex. F at ¶5; Ex. L at NDOC000060-NDOC000063. When the escort arrived just outside the property room, Montelongo spat in the direction of Sgt. Weiland, hitting Sgt. Weiland's glasses. Ex. F at ¶5; Ex. L at NDOC000060-NDOC000063. Sgt. Weiland merely observed as CERT officers then placed Montelongo prone on the ground and segmented him; officers then retrieved and placed a spit mask over Montelongo's head. Ex. F at ¶7-8, 10-13; Ex. L at NDOC000060-NDOC000063.

Officers retrieved and resumed the handheld camera recording around 10 PM, with Montelongo segmented on the ground outside the property room. Ex. F at ¶9; Ex. M – Handheld Video from IR-2022-ESP-002218 at 00:00-01:00. Montelongo was then escorted into a property holding cell, where Montelongo was uncooperative with CERT Officers' attempts to apply waist restraints through the cell door. Ex. M at 01:00-06:45. CERT Officers entered the holding cell and successfully applied wrist restraints. *Id.* at 06:45-

08:30. Montelongo was then escorted to and placed in the transport van. *Id.* at 08:30-10:41. Montelongo was driven to WBRH without further incident. Ex. F at ¶9.

**C. Hospital Records from WBRH**

Montelongo was assessed in the Emergency Room at WBRH by a Dr. Ha Vu, M.D., who noted, based upon reports of Montelongo and the attending correctional officer, that Montelongo had experienced a "head injury and brief loss of consciousness for a few minutes." Ex. N at NDOC00126. Montelongo reported "pain is his wrist and ankles" likely due to restraints, "but no head pain, nausea, vomiting, chest pain, [or] shortness of breath." *Id.* Dr. Vu noted Montelongo appeared "disheveled" with an "odor of alcohol detected." *Id.* at NDOC000127. Further, Montelongo displayed an apparent "hematoma left orbital" approximately "0.79 in" and several abrasions, but Montelongo showed no signs of neurological involvement. *Id.* Dr. Vu did not note any pain or injury to either of Montelongo's hands. *Id.* at NDOC000126-NDOC000129.

Dr. Vu ordered urinary drug and blood alcohol screenings, which showed a blood alcohol level of 170 mg/dL, consistent with the degree of intoxication Montelongo exhibited that evening. *Id.* at NDOC000131-NDOC000132. A CT scan of Montelongo's head was performed, showing "acute fractures of the anterior and posterior walls of the left maxillary sinus," "an acute left orbital floor fracture," and "an acute comminuted fracture of the left zygomatic arch," with soft tissue swelling and blood in the maxillary sinus. *Id.* at NDOC000187, NDOC000142-NDOC000143. The CT indicated "no hemorrhage, hydrocephalus, mass-effect, or herniation." *Id.* There being "[n]o indication for emergent surgery at this point," Montelongo was considered "stable enough to be discharged back to the prison with instructions to use ice and ibuprofen for swelling, Tylenol for pain control." *Id.* at NDOC000127-NDOC000129. Dr. Vu indicated that no follow-up care was necessary. *Id.* at NDOC000129-NDOC000130, NDOC000144.

**D. Subsequent Medical Records**

Montelongo was discharged to the ESP infirmary at 1:00 AM on October 29, 2022. Ex. N at NDOC000266. A provider entered telephonic orders prescribing 5mg oxycodone

twice daily for three days and Tylenol 650mg twice daily for 30 days for pain, ordering staff to schedule a follow-up appointment on October 31, 2022. *Id.* at NDOC000249.

On November 14, 2022, Montelongo was seen by an NDOC provider, who noted swelling in Montelongo's right hand, and no apparent vision alteration related to the prior head injury. *Id.* at NDOC000265. Dr. Bryan issued orders to discharge Montelongo from the infirmary, for an X-Ray of Montelongo's right hand, and to follow-up with a provider regarding the X-Ray results. *Id.* at NDOC000248. Dr. Bryan indicated that Montelongo refused an additional referral to an optometrist. *Id.*

Nursing staff placed Montelongo on a list for an appointment with the institutional radiologist. *Id.* at NDOC000188. X-Rays of Montelongo's right hand were taken on January 24, 2023, which showed a "[f]racture of the distal aspect of the fifth metacarpal." *Id.* at NDOC000086. Dr. Joseph Benson reviewed the X-Ray report and issued orders for a splint, Tylenol, Ibuprofen, an orthopedic referral, and a follow-up with a provider. *Id.* at NDOC000225, NDOC000246. An orthopedic evaluation was requested and scheduled for March 13, 2023, but Montelongo refused the appointment. *Id.* at NDOC000083-NDOC000084, NDOC000209.

**E. Disciplinary Hearings and Grievance Records**

Montelongo was served two separate "MJ3 Battery" disciplinary charges in Offense in Custody (OIC) No. 513820 and 513822 and regarding Incident No's. IR-2022-ESP-002217 and IR-2022-ESP-002218. Ex. O – Disciplinary Forms I-III re OIC 513820; Ex. P – Disciplinary Forms I-III re OIC 513822. Lt. Rigney chaired the disciplinary hearings in each OIC, held on January 5, 2023, and December 22, 2022, respectively. *Id.* Both hearings were recorded; at no point is Montelongo heard informing Lt. Rigney "that he wasn't receiving treatment for his broken hand." *Id.*; Ex. Q – OIC 813820 Disciplinary Hearing Audio; Ex. R - OIC 813822 Disciplinary Hearing Audio; Ex. C at ¶3. Montelongo was found guilty of each MJ3 and was sanctioned accordingly. Ex's. O & P.

On December 20, 2022, and January 25, 2023, Montelongo submitted first level grievances in Grievance No's. 2006-31-47024 and 2006-31-47957 appealing these

disciplinary convictions. Ex. S – Grievance No. 2006-31-47024; Ex. T – Grievance No. 2006-31-47957. Therein, Montelongo claimed he had not received treatment for his "broken hand," requesting "medical treatment expedited for [his] hand." Ex. S at NDOC000044-NDOC000045. On March 6 and May 23, 2023, Warden Gittere issued responses denying Montelongo's grievances and each of his requested remedies and advising Montelongo that he could "file a medical kite for medical treatment at any time." Ex. S at NDOC000042.

Warden Gittere and Lt. Rigney both declare that they did not supervise ESP medical staff, and thus neither of them had any authority to order medical treatment or expedite any of Montelongo's medical treatment. Ex. B at ¶¶5-7; Ex. C at ¶¶5-6. Instead, Montelongo should have submitted a medical kite to the medical department. *Id.* Alternatively, Montelongo should have submitted his request for expedited treatment in an informal grievance separate from his disciplinary appeal, which would have been review by medical staff instead. *Id.*; Ex. U – AR 740 eff 2022-4-28 at 740.08(2)(B).

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

Summary judgment allows courts to avoid unnecessary trials when there is no dispute as to the facts. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The purpose of summary judgment is to isolate and then terminate claims that are factually unsupported. *Id.* at 323–24. A moving party is not required to disprove the non-moving party's claims. *Id.* Instead, the moving party is simply required to point out the absence of evidence supporting the non-moving party's claims. *Id.*

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does indeed exist. *Matsushita*, 475 U.S. at 586. Material facts are facts that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court should not consider disputes concerning irrelevant or unnecessary facts. *Anderson,* 477 U.S. at 248.

The opposing party is not permitted to merely rely upon its pleadings; it must tender evidence of specific facts which create a genuine issue of material fact. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11; *Anderson,* 477 U.S. at 255. The opposing party is not required to establish a material issue of fact conclusively as it is enough that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987). The evidence of the non-moving party is to be believed, and all reasonable inferences must be drawn in favor of the opposing party. *Matsushita*, 475 U.S. at 587 (citations omitted); *Anderson*, 477 U.S. at 255.

However, reasonable inferences are not drawn out of the air; it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244–45 (E. D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *T.W. Elec. Serv.*, 809 F.2d at 631. The court is concerned with establishing the existence of genuine issues, and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

The facts are only "viewed in the light most favorable to the nonmoving party if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.,* (quoting *Matsushita*, 475 U.S. at 586–87). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## V. LEGAL ARGUMENTS

### A. Defendants are Entitled to Qualified Immunity

Defendants are entitled to qualified immunity on all claims. This is because, in addition to the undisputed facts establishing that Montelongo's constitutional rights were not violated, there is also no case law that would put Defendants on clear notice that their actions violated Montelongo's constitutional rights.

It is a long-standing principle that governmental officials are shielded from civil liability under the doctrine of Qualified Immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The rule of qualified immunity "'provides ample support to all but the plainly incompetent or those who knowingly violate the law.'" "Therefore, *regardless of whether the constitutional violation occurred,* the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Furthermore, "[t]he entitlement is an immunity from suit rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial."

*Shroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995) (emphasis in original; internal citations omitted).

When conducting the qualified immunity analysis, courts "ask (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established." *C.B v. City of Sorona*, 769 F.3d 1005, 1022 (9th Cir. 2014) (internal citation omitted). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Or "if the law did not put the [official] on notice that his

conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id*. at 202.

*1. Coulston and Elmore did not personally participate in the use of force*

There is no vicarious liability in § 1983 lawsuits. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Hence, a government official—whether subordinate or supervisor—may be held liable under § 1983 only for their "participation" in the alleged constitutional deprivation. *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012) ("[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct") (quoting *Iqbal*, 556 U.S. at 677); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant").

Absent direct participation, an individual may only be liable for "setting in motion a series of acts by others," or "knowingly refusing to terminate a series of acts by others, which [he] knew or should have known would cause others to inflict a constitutional injury." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (citation and quotation marks omitted). If the individual lacks authority to terminate the offending acts, then his refusal does not impute liability. *Williams v. Keast*, No. 3:22-CV-00430-CLB, 2025 WL 3640975, at *7 (D. Nev. Dec. 15, 2025) (citing Blake v. Thomas, 2024 WL 5205741, at *1 (9th Cir. 2024))

Theories of personal participation in the context of a Fourth Amendment excessive force claim also apply in the context of an Eighth Amendment excessive force claim. *See Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (utilizing "failure to intercede" and "integral participation" theories native to the Fourth Amendment context to find that certain defendants did not personally participate and were not liable for excessive force in violation of the Eighth Amendment). Where an officer is alleged to have used excessive force under either amendment, other officers can be held liable under § 1983 for their "failure to intercede" and "integral participation" in the alleged use of force. *Id*.

An officer may be held liable for their integral participation in alleged use of excessive force only if they participated "in some meaningful way" in the use of force. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004) (integral participation where officers participated meaningfully in a search operation during which a flash bang was deployed). An officer may be held liable for failing to intercede in another officer's alleged use of excessive force if "they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000) (no failure to intervene claim where there was no realistic opportunity for officers to prevent a rapidly unfolding shooting).

Neither Coulston nor Elmore were present for or involved in the escort from visiting to the property room, during which the use of force in IR-2022-ESP-002218 took place. Both officers were relieved following the preceding incident in IR-2022-ESP-002217, their injuries were assessed by nursing staff, and both officers promptly left for the hospital. Elmore and Coulston were relieved soon thereafter, and their injuries were assessed by nursing staff. Ex. D at ¶ ; Ex. E at ¶ ; Ex's. G & H at ¶ . Neither officer was involved in later events that evening. Ex. D at ¶ ; Ex. E at ¶ ; Ex. F at ¶14.

It is undisputed that neither Coulston nor Elmore were meaningfully involved in the escort from visiting to the property room, and neither officer was present such that he had any opportunity to intervene in the use of force. Since neither Coulston nor Elmore were present for the escort and resulting use of force, it is undisputed that neither officer personally participated in any use of force. Montelongo cannot establish that Coulston and Elmore violated the Eighth Amendment, and both officers are entitled to entitled summary judgment.

*2. CERT Officers did not apply excessive force to restrain Montelongo*

In the prison context, liability for any use of force turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). As noted in *Hudson* and *Whitley*, "the core judicial inquiry is . . . *whether force was applied* in a good faith effort to maintain

or restore discipline, or maliciously and sadistically for the purpose of causing harm." *Id.* (emphasis added). An inmate must show that he was subject to force that was intended to harm or punish, regardless of whether he was the intended recipient. *Robins v. Meecham*, 60 F.3d 1436, 1440 (9th Cir. 1995).

Not every unnecessary or "malevolent touch by a prison guard" violates the Eighth Amendment. *Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights")). Although an inmate need not have suffered serious injury to bring an excessive force claim against a prison official, the Eighth Amendment necessarily excludes from constitutional recognition *de minimis* uses of physical force, "provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10 (quoting *Whitley*, 475 U.S. at 327).

Liability for any use of force turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm." *Hudson*, 503 U.S. at 6-7. In distinguishing between good faith and malice, courts of this Circuit balance five factors: (1) the threat reasonably perceived by the prison officials; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the inmate's injuries. *See Hudson*, 503 U.S. at 7.

a. Any Use of Force Was *De Minimis*

Force that escorting CERT Officers—none of whom are named Defendants in this action—applied to lay Montelongo prone was *de minimis*. Montelongo cannot establish that documented left eye swelling and fractures were caused by the incident in IR-2022-ESP-002218, instead of the preceding incident in IR-2022-ESP-002217. The medical records blatantly contradict any such allegation Montelongo may attempt to make in that regard, as Montelongo was examined by nursing staff prior to the incident in IR-2022-ESP-002218, and his left eye was already swollen consistent with these injuries. Ex. G at ¶ 5; See Ex. K;

Ex. N at NDOC000270. Montelongo cannot establish, as alleged, that these injuries somehow originated *after* this examination took place.

Nor can Montelongo establish that his hand injury originated with the use of force in IR-2022-ESP-002218. Surveillance footage from before the incident, and handheld footage from immediately after, shows Montelongo's hands were retrained behind his back in handcuffs. Ex. J-6 at 9:52; Ex. M at 1:00-1:30. Consistent with their training, CERT Officers laid Montelongo prone (on his stomach) during the incident, and such could not have caused any injury to Montelongo's hands positioned behind his back. *Id.*; Ex. F at ¶¶7-8. Notably, WBRH staff did not note, and Montelongo did not report, any pain in or injury to Montelongo's hands. Ex. N at NDOC000126-NDOC000129.

Montelongo cannot establish that laying him prone caused any of his documented injuries; nor is the act of laying an inmate prone to apply a spit mask "conscience shocking." Given the *de minimis* nature of the force at issue, Montelongo cannot prevail on his excessive force claim against Sgt. Weiland or any unnamed CERT Officer.

b. <u>The Five Factors Weigh Against Any Malicious Purpose</u>

To the extent any force was applied, there is no evidence of any malicious or sadistic purpose. Spitting or otherwise propelling body fluids is a recognized threat to officer safety. Ex. F at ¶7. Officers are trained to respond by restraining the spitting inmate in the prone position until a spit mask can be applied. *Id.* at ¶7. Given Montelongo's inebriation and repeated attempts to spit on officers, CERT Officers reasonably perceived a need to place Montelongo prone to restrain him until a spit mask could be applied. CERT Officers applied force commensurate with this need.

CERT Officers made repeated efforts to attenuate the force necessary to correct Montelongo's behavior. That is, CERT Officers gave Montelongo orders to face forward and away from escorting officers. *See* Ex. L; Ex. F at ¶4. When these commands failed, CERT Officers changed escort position. *Id.* at ¶5. Only when this change of escort position failed to prevent Montelongo from spitting on Sgt. Weiland did CERT Officers decide to place Montelongo prone to put a spit mask over his head. *Id.* at ¶¶6-8. It is thus undisputed that

CERT Officers only resorted to laying Montelongo prone when verbal orders and a modified restraint position proved ineffective to obtain his compliance.

Again, there is no evidence Montelongo's injuries were caused by any force applied to lay Montelongo prone or restrain him in that position. Taken together, these factors cannot establish that CERT Officers intended to harm Montelongo rather than to coerce his compliance with lawful orders to comply with escort. These factors weigh against any purpose to harm, and thus Montelongo cannot establish that Sgt. Weiland or any unnamed CERT Officers violated the Eighth Amendment.

*3. Gittere and Rigney did not personally participate in any delay of care*

Neither Gittere nor Lt. Rigney—neither of whom are medical professionals—personally participated in any alleged delay in care regarding Montelongo's injuries. There is no evidence Lt. Rigney was ever placed on notice of alleged delays during disciplinary hearings in OIC No's. 513820 & 513822. Ex. C at ¶4; *See* Ex's. Q & R. Absent constructive notice of any delays, Montelongo cannot establish that Lt. Rigney knowingly acquiesced in any delay—let alone that Lt. Rigney was somehow deliberately indifferent to Montelongo's care.

But even then, both Gittere and Lt. Rigney lacked authority or the ability to terminate the alleged delay in care. *See Williams, 2025 WL 3640975*, at *7, *9 n. 4. Defendants did not supervise institutional medical and nursing staff in their scheduling or provision of care. Ex. B at ¶¶5-7; Ex. C at ¶¶5-6. Supervision of institutional medical care was the responsibility of the NDOC Medical Director; supervision of nursing care and the scheduling of medical care were the responsibility of the supervising institutional Directors of Nursing Services and the Chief of Nursing Services. *Id*. Defendants could only advise Montelongo to submit an appropriate request to the medical department, which is exactly what Gittere did in this case. Ex. B at ¶7; Ex. S at NDOC000042.

As neither Gittere nor Lt. Rigney had authority to remedy any delay in or denial of care, it is undisputed that neither knowingly acquiesced in the same. Montelongo cannot establish that Defendants Gittere and Lt. Rigney violated the Eighth Amendment, and both Defendants are entitled to entitled summary judgment.

*4. Responsible medical staff did not violate the Eighth Amendment*

To prevail on a claim for deliberate indifference to a serious medical need, Montelongo must establish "(1) the existence of a serious medical need; and (2) that the defendants' response to the need was deliberately indifferent by showing (a) a purposeful act or failure to respond to a plaintiff's pain or possible medical need, and (b) harm caused by the indifference." *Windham v. Wofford*, 22-15387, 2023 WL 417907, at *1 (9th Cir. Jan. 26, 2023) (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

To establish that Defendants were "deliberately indifferent" to the alleged medical need, Montelongo must prove Defendants knew "of and disregard[ed]" the risk his medical condition created. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference" requires actual knowledge, meaning Defendants must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [Defendants] must also draw the inference." *Id*. at 837. It is not enough that Defendants should have known, *Id*. at 841-42, and mere negligence is also insufficient, *Id*. at 835-36.

Montelongo must show indifference resulted in "further significant injury or the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (internal quotations omitted). Mere delay, absent resulting injury or pain, is insufficient. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference").

a. <u>Montelongo received medically acceptable care for his left eye</u>

It is undisputed that institutional medical staff did not violate the Eighth Amendment with respect to the care provided for Montelongo's injuries. It is undisputed that Montelongo received adequate diagnostic and palliative care to treat the swelling and fractures surrounding his left eye. Dr. Vu at WBRH recommended palliative care to the extent these injuries would heal on their own, Ex. N at NDOC000127-NDOC000130, NDOC000144, and there is ample evidence ESP medical providers complied with this plan of care, *Id*. at NDOC000248-NDOC000249. Staff additionally recommended a referral to outside optometry, which Montelongo himself refused. *Id*. Montelongo lacks evidence to establish this care was

medically unacceptable under the circumstances or otherwise deliberately indifferent to any of his serious medical needs, and thus his claim fails as to these injuries.

b. Any delay re metacarpal fracture did not lead to additional harm

Delay in diagnosing Montelongo's metacarpal fracture did not result in any additional harm. Evidence establishes an apparent delay in care regarding the injury to Montelongo's hand, which was attributable to a lengthy waitlist for the internal radiologist to perform an X-Ray. *Id.* at NDOC000188. Once this X-Ray diagnosed a metacarpal fracture, staff promptly requested and scheduled a consultation with an outside orthopedic specialist. *Id.* at NDOC000225, NDOC000246. On the day Montelongo was scheduled to attend the clinic appointment at WBRH, Montelongo refused the appointment. *Id.* at NDOC000083-NDOC000084, NDOC000209.

Based upon his refusal of care following diagnosis of the metacarpal fracture, Montelongo cannot establish that any delay in diagnosis and scheduling this appointment led to any additional harm. Gittere and Lt. Rigney are thus entitled to summary judgment on the merits of Montelongo's claim and as more fully addressed below, on the first prong of the qualified immunity analysis.

*5. Any Constitutional Violation Was Not Clearly Established*

Defendants are also entitled to protection under the second prong of the qualified immunity analysis. This is because they are entitled to qualified immunity in situations where "the law did not put [them] on notice that [their] conduct would be clearly unlawful." *Saucier*, 533 U.S. at 202.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (quoting *Pearson*, 555 U.S. at 231). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 6 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743, 131 (2011)).

Furthermore, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation and internal quotation marks omitted). In other words, while courts "'do not require a case directly on point' before concluding that the law is clearly established, . . . 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Stanton*, 571 U.S. at 6 134(quoting al–Kidd, 563 U.S. at 741). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Id.* (citation and quotation marks omitted). Thus, courts must ask "whether a reasonable officer could have believed that his conduct was lawful." *Dixon v. Wallowa Cnty.*, 336 F.3d 1013, 1019 (9th Cir. 2003).

It is plaintiff's burden to prove that the law was clearly established regarding an alleged constitutional violation at the time of the alleged violation. *See Miller v. Cnty. of Nye*, Case No. 21-16826, 2022 WL 16570782, at *1 (9th Cir. Nov. 1, 2022) (holding that "the plaintiff bears the burden of proving that: (1) taken in the light most favorable to the plaintiff, the facts alleged show that the officers violated a constitutional right; and if so, (2) the right was clearly established at the time of the violation"); *Simmons v. G. Arnett*, 47 F.4th 927, 934–35 (9th Cir. 2022) (holding that to overcome qualified immunity, the "plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the violation").

The doctrine of qualified immunity protects the Defendants in this case because they did not undertake actions that could be considered clearly unlawful. As set forth above, Defendants' conduct did not violate Montelongo's rights under federal law.

Defendants are unable to locate any law in this jurisdiction providing notice that their conduct was considered clearly unlawful. *Saucier*, 533 U.S. at 201. There is no clearly established law that an officer violates the Eighth Amendment by laying an inmate prone to place a spit mask over his head. There is no evidence Defendants are deliberately

indifferent to plaintiff's medical needs for failing to provide care that the plaintiff has refused. There is no clearly established law that Defendants are liable for acquiescing in acts or omissions constituting a constitutional violation where they have no notice of the violation and no authority to terminate the alleged violation. Montelongo, therefore, cannot meet his burden of proof to show a violation of clearly established law.

Defendants are entitled to qualified immunity because they acted reasonably and were not plainly incompetent. This Court should grant Defendants' Motion for Summary Judgment.

**B. Montelongo is Not Entitled to Compensatory or Punitive Damages**

*1. Compensatory Damages*

Notwithstanding the defense of qualified immunity, Montelongo cannot prove by preponderance of the evidence that he is entitled to compensatory damages. As argued, Montelongo cannot prove that these injuries were attributable to the particular use of force that is the subject of this lawsuit. Furthermore, as argued, Montelongo cannot establish that he suffered any further compensable pain or injury attributable to any delay of denial of care for these injuries.

Montelongo cannot prove by preponderance of the evidence that he suffered any compensable pain or injury. Thus, Defendants are entitled to summary judgment on the issue of compensatory damages.

*2. Punitive Damages*

In Nevada, "punitive damages may be awarded when the plaintiff proves by clear and convincing evidence that the defendant is 'guilty of oppression[;] fraud[;] or malice, express or implied.'" *Peters v. Swift Transportation Co. of Arizona, LLC*, No. 2:19-cv-00874-GMN-EJY, 2023 WL 375985 at *4 (D. Nev. Jan. 23, 2023) (citation omitted). "The standard for punitive damages under §1983 mirrors the standard for punitive damages under common law tort cases…. [S]everal states in the Ninth Circuit require proof by clear and convincing evidence before punitive damages are awarded on a state law claim" 9th Cir.

Model. Civ. Jury Instrs. 5.5 (quoting *Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005))*. The State of Nevada is no exception. Nev. Rev. Stat. § 42.005.

"'Malice, express or implied' means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." *Russo v. Duracell, Inc.*, No. 2:21-cv-01403-GMN-DJA, 2022 WL 960591 at *3 (D. Nev. Mar. 29, 2022) (*citing* NRS 42.001(3)). "'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." *Id.* (*citing* Nev. Rev. Stat. § 42.001(1)).

Here, even if summary judgment is denied as to the Eighth Amendment claim, Montelongo lacks clear and convincing evidence of malice, express or implied, upon which a reasonable juror could award punitive damages. Evidence establishes that Defendants did not intend to harm Montelongo, but rather to prevent him from spitting on officers during escort. Likewise, there is no evidence Defendants consciously disregarded any need for care of Montelongo's documented injuries. There is simply no evidence, let alone clear and convincing evidence, that Defendants intentionally and maliciously harm Montelongo.

The undisputed facts fail to establish the requisite conscious disregard, and certainly fail to show malice or despicable conduct. Accordingly, Defendants are entitled to summary judgement on the issue of punitive damages.

## VI. CONCLUSION

This Court should grant Defendants' Motion for Summary Judgment. Montelongo cannot establish that Defendants Elmore and Coulston personally participated in the alleged use of force, let alone that such force was more than *de minimis* or that it was intended to harm. Montelongo cannot establish that Defendants Gittere and Rigney knowingly acquiesced toward any delay in providing medical care for Montelongo's injuries. Care for Montelongo's eye injuries was medically acceptable under the circumstances, and delay in diagnosing Montelongo's metacarpal fracture did not result in any further harm. Montelongo cannot establish by preponderance of the evidence that he suffered any compensable pain or injury, and there is no clear and convincing evidence that he is entitled

to punitive damages. Defendants are entitled to protection for Montelongo's claims under the doctrine of qualified immunity.

DATED this 9th day of January, 2026.

AARON D. FORD
Attorney General

By: /s/ Samuel L. Pezone Jr.
SAMUEL L. PEZONE JR. (Bar No. 15978)
Deputy Attorney General

*Attorneys for Defendants*

**INDEX OF EXHIBITS**

Exhibit A – Bed History Report

Exhibit B – Declaration of Wiliam Gittere

Exhibit C – Declaration of Curtis Rigney

Exhibit D – Declaration of Christopher Coulston

Exhibit E – Declaration of Edward Elmore

Exhibit F – Declaration of James Weiland

Exhibit G – Declaration of Monisha Wilson

Exhibit I – Investigation Detail Report

Exhibit J – Surveillance Video re IR-2022-ESP-002217

Exhibit K – Handheld Video (M2U00189) re IR-2022-ESP-002217

Exhibit L – Investigation Detail Report re IR-2022-ESP-002218

Exhibit M – Handheld Video (M2U00191) re IR-2022-ESP-002218

Exhibit N– Excerpt of NDOC Medical Records

Exhibit O – Disciplinary Forms I-III re OIC 513820

Exhibit P – Disciplinary Forms I-III re OIC 513822

Exhibit Q – OIC 513820 audio

Exhibit R – OIC 513822 audio

Exhibit S – Grievance No. 2006-31-47024

Exhibit T – Grievance No. 2006-31-47957

Exhibit U – AR 740 eff 2022-4-28

## CERTIFICATE OF SERVICE

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on January 9th, 2026, I electronically filed the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via this Court's electronic filing system. Parties who are registered with this Court's electronic filing system will be served electronically.

Victor Montelongo #1020756
High Desert State Prison
P. O. Box 650
Indian Springs, Nevada 89070
*Plaintiff, Pro Se*

/s/ Jamile Vazquez
JAMILE VAZQUEZ, an employee of the
Office of the Nevada Attorney General